Members of the Senate
Alabama State House
Montgomery, Alabama 36130
Dear Senators:
We have received Senate Resolution No. 64, which requests our written opinion as to whether Senate Bill 89, which allows less than unanimous jury verdicts in all civil actions, violates § 11 of the Constitution of Alabama, 1901.
Senate Resolution No. 64 reads as follows:
‘Without violating Section 11 of the Constitution and other constitutional safeguards of the right to trial by jury, can the Legislature by law dispense with the historic requirement of a unanimous jury verdict and provide that the verdict in all civil cases tried to a jury shall be the verdict agreed to by not less than nine jurors?”
We answer your question in the negative. Our answer is based upon our reading of the Official Proceedings of the Constitutional Convention of 1901, during which a substantial majority of the delegates rejected an identical proposal that would have provided that three-fourths of the jury in civil actions could render a verdict.
What is now § 11 of the Constitution, to which you refer in your request for an advisory opinion, was presented to the Constitutional Convention of 1901 as § 12. On the 38th day of the Session, July 6, 1901, the Convention considered a minority report that would have provided that “in civil actions three-fourths of the jury may render a verdict.” This minority report was filed by Delegates Samuel Blackwell, of New Decatur, Morgan County; E.P. Wilson, of St. Stephens, Clarke County; and T.J. Cornwell, of Bessemer, Jefferson County, and, as recorded in 2 Official Proceedings 1677-78, Constitutional Convention of 1901, State of Alabama, it reads as follows:
“The undersigned members of the committee on Preamble and Declaration of Rights do not concur in the foregoing report of the committee so far as it relates to Section 12, Article I, for the following reasons:
“In every relation of life in Alabama, where the result is dependent upon the opinions and decisions of a number of persons, the principle of majority rule governs, with the single exception of a verdict of a jury. Why should a unanimous verdict on a question of fact be required and enforced from a jury? A majority of one vote in this Convention either puts a proposition in the organic law, or rejects it. A majority of one vote in each House of the General Assembly creates, repeals, or modifies a positive law, regardless of the magnitude of the interests involved. A majority of the Senate of the United States ratifies or refuses to consent to a treaty with a foreign power. A majority of a single vote in a half a million in a pivotal State may elect a President of the United States, change the policy of the Government and bring prosperity or ruin to seventy millions of people. And yet the majority of the committee deny that it would be sensible to apply this principle to a verdict of a jury in a civil suit at law. When a judgment is entered on a unanimous verdict, if an appeal is taken to the Supreme Court of the State it can be then *116 finally adjudicated by a bare majority of the Justices. So in the Supreme Court of the United States, five of the Justices against four held the income tax unconstitutional; and in the same court five of the Justices held that Porto Rico was not under the Constitution, and four that it was. Again in all ministerial and executive bodies the majority rules, and the will of the minority must give way to that of the majority when lawfully expressed. For these reasons we think that the provisions authorizing three-fourth of a jury to render a verdict in a civil case should become a part of our Constitution as it is of several other important States of the Union.
“We therefore recommend as a substitute for Section 12, Article I, as reported by the committee, the following:
“Art. I, See. 12: The right of trial by jury as heretofore enjoyed, shall remain inviolate; but in civil actions three-fourths of the jury may render a verdict.
“Respectfully submitted,
“Samuel Blackwell
“E. P. Wilson
“T. J. Cornwell.”
Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1677-78.
Mr. Blackwell, as one who had signed the report, addressed the convention, arguing, among other things, that there were a lot of mistrials occurring and that “[tjhere are cases being tried and constantly, where one party has no hope of a verdict, and yet as the law requires a unanimous jury, if that party can succeed in fixing one member of the jury he can secure a mistrial and a delay which makes it harder to have the witnesses there at a succeeding trial.” p. 1678. He further noted the history of the requirement of a unanimous verdict and noted that many other States, by their constitutions, did not require unanimous verdicts in civil cases.[1]
*117 Delegate Charles P. Beddow, of Birmingham, Jefferson County, rose “to endorse the report of the minority of this committee” and argued in favor of the minority report, contending that in Alabama “in all lines and in all departments of life great progress has been made except in this one feature of our government — trial by jury,” and that “[a] *118 number of States have already made some progress along this line, but Alabama is still in the rear.”[2]
*119 Delegate B. Boykin Boone, of Mobile, Mobile County, argued that the minority report should be adopted and suggested that allowing three-fourths of a jury of 12 to decide an issue of fact would not be any worse than allowing an equity judge to decide similar questions affecting property rights -without benefit of a jury. He asked: “Now, why should the Chancellor be able to pass on a question where there are hundreds [of] thousands of dollars involved, and his decision be affirmed by a bare majority of a court, when in a damage suit against a railroad company you have got to have the unanimous verdict of the jury?” Id. 1686. He argued that Alabama could profit by what had been found to be good in other States.[3]
*120 Another delegate, stating that “a three-quarters majority verdict [might] be too radical a change,” proposed an amendment to the minority report to change “three-quarters” to “five-sixths.” Id. 1686. There was a motion made to table the amendment to the minority report and the minority report, but by a vote of 43 ayes and 43 noes the motion to table was lost and the convention adjourned without further debate on the issue. Id. 1689.
When the Convention reconvened on the 39th day, July 8, 1901, the question was on the adoption of the minority report on § 12, which provided that in civil actions three-fourths of the jury might render a verdict. Opponents of the minority report argued strongly against the adoption of the minority report.
Delegate Thomas L. Long, of Jasper, representing what was then the Sixth Congressional District, claimed that the proposal in the minority report was “but a step of some men who are hostile to corporations, in order to get large verdicts and unjust verdicts against corporations in the State of Alabama,”[4] and that “[i]f there [was] merit in *121 this question there should be power given to the Legislature to do this, so if it proves a bad thing it can be undone.”[5] He further commented on jury selection procedures, which he claimed were harmful, a claim that was echoed by Delegate J.F. Thompson, of Centerville, Bibb County, who represented what was then the Ninth Congressional District.[6]
Delegate Frank S. White, of Birmingham, who was a State-at-Large delegate to the Convention, answered those who had claimed that the minority report was being “urged by men who want to ‘hold up’ corporations,” and argued that the requirement of having unanimous verdicts should not be preserved just because of its antiquity.[7] James Weatherly, of Birmingham, one of Jefferson County’s *122 delegates, responded to Delegate White by stating that requiring unanimity protected those who were unpopular in the community and who otherwise would be oppressed and stating that “corporations are weak in public opinion,” but that wealthy persons in a community should be entitled to a fair jury trial, to which argument there was a response.[8]
*123 After debating the issue thoroughly, the Convention voted to reject the minority report, by a vote of 81-29, with 45 delegates not voting. Id. 1726-27.
We have included in this opinion substantial portions of the Convention debates on the issue presented by Senate Bill 89, and after reading and considering these debates on the very issue you inquire about, we are clear to the conclusion that the Constitutional Convention considered and rejected that which is proposed by Senate Bill 89. Consequently, we opine that Senate Bill 89, as written, would violate § 11 of the Constitution of Alabama, 1901.[9]
To paraphrase what Mr. Justice Jones wrote for the Court in Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), if such a radical restructuring of the judicial process to authorize less than unanimous verdicts is deemed wise or necessary, it must be accomplished by an amendment to Alabama’s Constitution.
Respectfully submitted,
PERRY 0. HOOPER, Sr. Chief Justice
HUGH MADDOX RENEAU P. ALMON JANIE L. SHORES J. GORMAN HOUSTON, Jr. MARK KENNEDY RALPH D. COOK TERRY L. BUTTS HAROLD SEE Associate Justices

. The full text of his argument was as follows:
"MR. BLACKWELL — As one of the minority that made this report, I desire to be heard in regard to the matter.
"Mr. President, and gentlemen of the Convention, it is a fact that is known without the stating of it to this body that in a great many cases that are constantly being tried in our courts, cases of great importance that consume considerable amount of time, the tendency is growing to have mistrials, and those mistrials frequently result from one man refusing to agree with eleven others. And it is charged in many localities that influences are brought to bear to 'fix’ juries in order that mistrials may be had. There are cases being tried and constantly, where one party has no hope of a verdict, and yet as the law requires a unanimous juiy, if that party can succeed in fixing one member of the juiy he can secure a mistrial and a delay which makes it harder to have the witnesses there at a succeeding trial. As I say frequently those trials are of important cases and there are a great many witnesses and a considerable amount of time consumed and great expense incurred by the county. And yet under our present system, if you can fix it so that one man on the juiy will not agree, the whole expense had to be gone over, the whole matter retried and frequently the delay of the retrial renders it impossible to get as many witnesses present as were at the first trial.
“Eveiy gentlemen here has seen the growing tendency to have mistrials. Every man knows the expense incurred. While as I say these mistrials are frequently in the larger cases, cases of great importance, any case involving $20 may be tried by a juiy and a mistrial result and in these cases more time and money, multiplying the money many times the amount involved by this requirement of a unanimous verdict.
"Now the argument as presented in this minority statement prepared by Mr. Wilson from Clarke, sets forth the case very clearly. In every relation of life in Alabama as it is there stated, where the result is dependent upon the decision of a number, the principle of a majority rules. Then why should we have a unanimous verdict in civil cases?
[[Image here]]
“MR. BLACKWELL — ... Why should a unanimous verdict on the question of fact be required and enforced from a trial jury?
“There will be no answer to that except the statement that we have had this for a long time, that the present system is time honored, and, therefore, it ought not to be abandoned. If that principle were to govern none of the improvements of the nineteenth century that are demanded by our development ought to have been recognized and accepted. If everything of antiquity must be preserved and retained, we should have never had the splendid system of electric lighting we have today, but we ought to have retained and should now go back to the old tallow candle. We should go back to the stage coach or the ox team as a means of transportation rather than the splendid system of railways we have today. We should go back to the dug-out and the tom-tom rather than the ocean steamers of today if antiquily alone is what shall recommend a thing to us.
*117 "MR. WEATHERLY — Is not the fact that an institution is old some evidence that it is good?
"MR. BLACKWELL — Some evidence that it is good, but no evidence that there is not something better, no evidence that there cannot he an improvement. Men are constantly progressing, mind is constantly developing, surroundings are constantly changing and the result is we adapt our methods to the conditions surrounding us and thus create improvement.
"This system made its appearance in England soon after the Norman conquest.
"Remember we are not proposing to abolish this system or to apply this amendment to criminal cases. We apply it only to civil cases.
“As I say the system of a jury appeared in England soon after the Norman conquest in the [Eleventh] Century, but at that time the jury was not required to be unanimous. Prior to the time of Edward IV, majority verdict had been sufficient. We are not here dealing with the jury system, but simply with a unanimous verdict as to a matter of fact.
"Now the jury was originally called to give evidence, and one of the reasons for having a jury of twelve was, as history shows, that that was considered the amount of evidence necessary to establish the guilt or innocence of parties to a very large extent. The jurors were taken from the immediate community in which the offense was committed and were supposed to be entirely familiar with all the facts and issues involved in the trial of the case. As civilization progressed and communities enlarged it became apparent that you got men on the jury now and then who were not competent to give evidence. But they were still legally summoned jurors and when such were brought in it became necessary to go out and get others on the outside as the jurors did not know all the facts.
"MR. STEWART — Why not apply this to criminal as well as civil cases?
"MR. BLACKWELL — For the same reason that was suggested by my friend Mr. Ferguson, that it is harder to accomplish a reform that is sweeping than a reform that just touches one little subject. If we had proposed to apply it to all trials, gentlemen would have risen and exclaimed, ‘You are absolutely proposing to try a man where his life is involved with a less number of jurors than heretofore required,’ so we preferred first to say to the gentlemen of the Convention that we are applying it to a $20 trial rather than to the trial of a man for his life.
[[Image here]]
"MR. BLACKWELL — Now there are many constitutions that have this provision: Colorado, Florida, Idaho, Iowa, Louisiana, Missouri, Michigan, Montana, Nebraska, New Jersey, North Dakota, Washington and Wyoming, and I think there are some others.
“Some gentlemen cite us in opposition to our contention to sections of the United States Constitution, but those sections do not apply to the State courts and the State Constitutions can absolutely fix any number that they feel inclined to as a jury. The number of jurors is limited in these States I have just mentioned. In Montana, in civil cases two-thirds of the jury can render a verdict. In Idaho in all cases of misdemeanors five-sixths can render a verdict. In Iowa the legislature may authorize a verdict by less than twelve jurors in any of the inferior courts of the State.
"As I say, some have objected to this, claiming there is some conflict with the rights guaranteed by the Constitution of the United States. But the rights not delegated to the United States by the Constitution nor prohibited by the States are reserved to the States, and while the first six or seven amendments to the Constitution of the United States concede the right of trial by jury ... they are not to be understood as restricting the powers of the States and the States if they choose can provide for trials for all offenses against the State.
“MR. BULGER — Does this section reported by the Committee prevent the legislature from providing for a majority vote?
“MR. BLACKWELL — Yes. Heretofore the opinion has been that where no number was mentioned a jury meant twelve and that is unquestionably the result of everything that I have read on that subject.
"MR. BOONE — Has it not been decided by the Supreme Court of the United States that the first ten amendments to the Constitution of the United States apply to Federal power and not to States[?]
"MR. BLACKWELL — We are not talking about Federal power in this matter.
"MR. BOONE — But I say that is the limitation upon Federal power and not the power of the State, so that the State has the power to make this amendment?
"MR. BLACKWELL — There are cases in which juries are not used now, such as contempt of court and it is doubtful if a jury is aright in a contested election case as shown in our Alabama decisions and in damages to property taken for the public, the party is not entitled under many decisions to a trial by jury unless the Constitution of the State provides a tribunal for that purpose. The courts have said, where they have held that, that it is no more essential to have unanimity than the common law qualifications of jurors which have been continued in force.”
Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1678-81.

. The full text of Mr. Beddow's debate was as follows:
"MR. BEDDOW — I rise to endorse the report of the minority of this committee. As the gentleman who has just taken his seat has truly said, in all lines and in all departments of life great progress has been made except in this one feature of our government — trial by jury. A number of States have already made some progress along this line, but Alabama is still in the rear.
"MR. BOONE — She has not had the opportunity.
"MR. BEDDOW — This is the first opportunity she has had. As I say, great progress has been made along all lines except this. I know there are gentlemen in this Convention who will say that the trial by a jury of twelve men is a matter that comes to us from ancient days and is consecrated by precedent and cemented by time, but all this argument has been fully answered by the gentleman who has just taken his seat.
"Because a thing is old is no reason why improvement cannot be had. Under that argument, the boy was right who was going to mill with a bag of com to be ground and in one end of the bag he had com and in the other a rock. He asked why he didn't put a peck of com on the other side and carry a half bushel instead of just one peck. He said his father always carried a rock in one of the bag and com in the other, and he was going to keep that up.
"This is the argument that the opposition used. Now we have some great men and some good men who are advocating this doctrine that a majority — even a majority of the jury— shall be able to render a verdict. One of our Justices of the Supreme Court of the United States, David J. Brewer, in a recent lecture to the students of Yale College advocated the abolition of the system of unanimous verdicts by juries.
"Judge A.B. Grace shows the ridiculousness of requiring unanimity in a juty. He says ‘This is an error that should not continue to exist. The majority system would practically remove the temptations of bribery. Under our law now one juror can dictate to all of the eleven others or make a mistrial. All a litigant now has to do is to fix one juror. Then he can have one of these mistrials, but with the majority system, he would have to bribe six jurors instead of one to even get a mistrial, which would always most surely leak out, and to get a verdict he would have to bribe seven jurors, and to keep his bribe a secret would be practically impossible.’
“Then he calls attention to facts that show the impractibilily and the ridiculousness of enlightened States continuing the system of unanimous juries. He says ‘In every relation of life in America where the result is made to depend on the opinions and decisions of a number of persons, the principle of majority rule has been adopted with the sole exception of the verdict of a jury.’
"A majority of one vote in each house of a General Assembly of Congress suffices to create, repeal or change a positive law, regardless of the magnitude of the interest involved as in the case of a currency bill, a tariff bill or a declaration of war.
"A majority in the National Senate ratifies or refuses to consent to a treaty with a foreign power.
"A majority of a single vote in half a million in a pivotal State may elect a President of the United States, change the entire policy of the Government, and bring prosperity or ruin to 70,000,000 of people. Yet lawyers, good lawyers, honest and patriotic lawyers, will roll their eyes in horror at the very suggestion that it would be sensible to apply the same principle in deciding a replevin suit of a ‘tickey’ calf or a 'pestle-tiled pony,' and yet again this calf or pony case when it has ascended by appeal from the Justice of the Peace court to the Circuit Court, and thence to the Supreme Court of the State, is decided by a bare majority of the judges, if they should happen to differ.
"Mr. President and gentlemen of the Convention, this is no new question. It has been agitated for a hundred years. I hold in my hand Forsyth’s History of Trial by Jury, a man known to the entire legal fraternity.
“A hundred years ago it was advocated by men like those, that it was ridiculous to adhere to the old principles of unanimity in the verdict of a petit jury.
“MR. WEATHERLY — Will the gentleman allow me to ask him a question?
"MR. BEDDOW — I decline to yield for questions. I have but ten minutes and I want to talk during that time. The gentleman no doubt will have an opportunity to answer what I have to say.
“On page 245 of Forsyth's History of Trial by Jury, he says: ‘In a valuable note in his Middle Ages, Mr. Hallam, speaking of the grand principle of Saxon polity, the trial of facts by the country says, from this principle, except as to the preposterous relic of barbarism, the requirement of unanimity, may we never swerve — may we never be compelled in wish to swerve.’
"He like myself believed in the verdict of a jury, and it is one of the greatest institutions that the country was ever blessed with, and by this improvement upon it, there can be nothing on earth that can replace it, but with it as it is, it permits one man to corrupt the jury and to throttle the will of eleven.
[[Image here]]
"... Under the present system, all that has to be done is that some friend to some lawyer be upon the jury and he will decide with him right or wrong. Some person who has some interest in it, apart from justice and right, may *119 purchase him before he enters upon the trial of the cause. You cannot tell me that is not the case. We see it every day in the week. In Birmingham not long ago there sat upon a jury a man who had said before the evidence had been heard, and before the charge of the court had been given to the juiy, that he had come there for the purpose of hanging the juiy, and that he has his money in his pocket, and he was going to sit there to make it a mistrial, unless the case was decided according to the way he desired it decided. The case went to trial, and in that self same case, that man did hang the juiy and produce a mistrial, when there were eleven men who had agreed upon the verdict. You tell me that in an enlightened age like this, that cases like that should be permitted? That it should be within the power of such persons to prostitute justice? I say nay, nay, the time has come when we should rise up in our might and purify the juiy system, by putting it beyond the reach of corrupt practices to produce mistrials, when justice is on the one side or the other.
"Mr. Forsyth further says: ‘when the House of Lords sit as a court of appeal, or as a criminal court to tiy a peer or in the case of impeachment of a commoner, a bare majority of one is sufficient to determine the judgment, and it may be fairly asked why the rule should be different for twelve jurors, and why if there be a single dissentient amongst them, no verdict can be given?’
"And gentlemen of the Convention, as early as seventy years ago, a commission in England, the place we get our jury system, investigated the question of the unanimity of the verdict of the juiy, in the year 1830, and in their report at that time they say, ‘it is essential to the validity of a verdict that the juiy should be unanimous, and regularly they are not allowed to be discharged unless by the consent of the parties, until such unanimous verdict has been returned. It is difficult to defend the justice or the wisdom of the latter principle. It seems absurd that the rights of a party in question of a doubtful and complicated nature, should depend upon his being able to satisfy twelve persons that one particular state of facts is the true one. As it is notorious that upon such questions a body of men so numerous are often found to differ irreconcilably in their views, it is obvious that the necessity of returning in every case a verdict, and a unanimous one, before they separate, must frequently lead to improper compromise among the jurors of their respective opinions. There is reason also to apprehend that where any of them happen to be actuated by partial motives, it must tend to produce a corrupt verdict. Indeed no one can have been conversant with courts of justices, without frequently having heard the remarks, where the verdict has been very long in suspense, that one or other of the contending parties has a friend upon the juiy.’
"And acting upon that report, and in the light of the present age, numerous States of this Union have fallen into line and have adopted the salient feature that was recommended by that commission seventy years ago. In concluding this remarks in this chapter, the author says, 'the time is fast approaching, if it has not already come, when trial by juiy, like eveiy other part of our legal fabric, will become the subject of the public criticism, and I feel persuaded that then it will be found impossible to justify or retain a rule which is both opposed to justice and expediency.’
"Now, Mr. President, and gentlemen of the Convention, in my county there are at least 25 per cent of the cases that go to the jury that result in a mistrial. It amounts to thousands and thousands of dollars to be paid out by the tax payers of this State for no other purpose than of peipetuating a system that has been condemned by .the wisest and best men that this or any other nation have ever known. Why should we stand back? We are here for the puipose of amending the Constitution, making it better, braiding it up, increasing its field of operation, and perfecting a system of law and justice.
“If you will make this amendment to this trial by juiy, by reducing it in civil cases to three-fourths, instead of the unanimity rule, it will produce great good to your State. It will prevent fraud and corruption in the temples of justice, and under its beneficent influences this State will continue to grow and to prosper and the temple of justice will not be prostituted once where it is a thousand times at present.”
Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1682-85.

. Delegate Boone argued:
"Mr. President and Gentlemen of the Convention, I wish to occupy your time only about two or three minutes further, on one suggestion that has not been made in the arguments of the gentlemen that have preceded me. *120 Nearly all of the reasons have been shown why the minority report should be adopted, but one, which it occurs to me is of very great importance, showing, as it does, the system of jurisprudence in Alabama, where certainly as much property, as many rights are involved. This applies only in civil cases as proposed by the minority report, and if the arguments of the opponents of the measure are sound, why should a Chancellor have the power to decide questions involving thousands of dollars’ worth of property in equity suits and pass on questions of fact, which are often the main questions in the case, and when an appeal is taken from his decree to the Supreme Court, where the judges also pass upon the facts, should the majority of those judges, three against two, affirm or reverse that decree?
“Now let us look at the progress of the law in Alabama in the equity field: For years it was the law in this State that when the Chancellor rendered a decree on a question of fact, and an appeal was taken to the Supreme Court of Alabama, there was a presumption, mind you, a presumption, indulged in by the Appellate Court in favor of the regularity and the correctness of the decree below. But the Legislature saw there was no reason for that, there was no sense in indulging in that presumption, and that was stricken down and the Supreme Court now tries the case when it comes up de-novo. Now, why should this one man, as some one has said on this floor today, this judge, who is but a man, and, as Stephen J. Field said in an opinion once in a case before the Supreme Court of the United States, because he sat on the bench, he did not fail to have the senses, he saw, he heard, and the sentiments, the same views, that a man had, were there with him. He tried to be perfectly impartial and to smother it all out, but he did not cease to be a man. Now, why should the Chancellor be able to pass on a question where there are hundreds [of] thousands of dollars involved, and his decision be affirmed by a bare majority of a court, when in a damage suit against a railroad company you have got to have the unanimous verdict of the jury? I say, gentlemen, that we are in line with this amendment, with progress, with the thoughtful men of all nations, and we should not claim that all the wisdom of the Union is here in Alabama; but we can profit by what has been found to be good in other States, and there is not a single State which has ever adopted this proposition (some of them having adopted it more than forty years ago), that have ever abandoned it, and I do hope that the Convention will adopt the minority report.”
Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1685-86.

. Mr. Long argued:
"MR. LONG — I am not a corporation lawyer, but I want to talk to this Convention a moment on a plain business proposition. I can see no good reason why three-fourths of the jury should be entitled to be allowed to bring in a verdict. We all know very well and we had as well be frank among ourselves that this is but a step of some men who are hostile to corporations, in order to get large verdicts and unjust verdicts against corporations in the State of Alabama. That is true, because I can cite instances, and I have in mind now an instance that happened in a sister county of mine where a preacher riding on a half fare ticket got jolted a little and brought a suit against a railroad company and eleven men wanted to give him a verdict for $7,500, but one man alone held that jury and afterwards that preacher gladly compromised the case for $150, and he was not entitled to one hundred and fifty cents. Now I will tell you what the farmers of the country will think about this. In my humble judgment they will say: Did you know what they have done down there at Montgomery? Another one will say no, I have not heard what they have done. Well they have fixed it so the fellows in town can get a verdict agin us with just nine men. We are poor folks and cannot get but three of our friends on the jury, and those fellows round town know them and can pick the jury agin us. The farmers and people of this State are not clamoring for this. Nobody wants it except men who are hostile and who are out after *121 corporations in this State. This question was not discussed before the people of Alabama. Nobody claimed that we were going to fix a three-quarter clause so far as juries were concerned.”
Id. 1703.

. Delegate Long stated:
“MR. LONG — ... Here we are asked to give up a system that has existed for centuries. If there is merit in this question there should be power given to the Legislature to do this, so if it proves a bad thing it can be undone. But there is no sensible reason why it should be put in the Constitution of Alabama. The people will rise up and rebuke it, you will invite the hostility of the corporations in Alabama. The farmers themselves will rebuke it, and believers in fair play will rebuke it. I am opposed to the three-quarter clause in the insurance laws of this State, and to the three-quarter clause in the jury laws. Why, when the lawyer comes to select the jurors in a murder case, or in an important case, they select some sap headed fellow who has got nothing himself and wants nobody else to have anything, and put him on the jury. Nine times out of ten you cannot get over three smart men on the jury on an average in this State. You know that is a fact. I have heard arguments made in the jury room myself that so and so has plenty of money, this corporation is rich, this poor fellow is poor, let us take it away from them. Everybody knows that that has happened in the jury box. I think this minority report will do a great deal of .harm in Alabama. I want the Convention to look at this thing fair in the face, and ask is it right to put a three-quarter clause in our Constitution which will invite the antagonism of everybody in the State, that wants fair play, corporations and everybody else? The people don’t want it, and I hope and believe this Convention will not have it done.”
Id. 1704.

. Delegate Thompson argued similarly that “[a]s has been mentioned by the gentleman from Walker [Delegate Long], it is rarely the case in an average county in Alabama that you have over two men out of twelve who are of such intelligence as they can weigh the evidence and apply the charge of the court to it.” Id. 1705.

. The text of Delegate White’s argument was:
"It seems to me that on a matter which should be decided from the stand point of reason, the motives of men on the other side should not be assailed; but it has been said here that it is being urged by men who want to ‘hold up’ corporations. Forty-three of them voted here who, I am as sure were as patriotic as the gentleman who voted on the other side. I might just as well and with just as much force say, if I were inclined to do it, though I am not, that the only opposition comes from the corporations, who are afraid of the jury. I say it would be as equally fair for me to say that as for the gentlemen to say what they have said. Now remember this is not an extreme thing. Nine men out of twelve must concur in a verdict. Surely three-quarters of any body united upon one thing carries with it conservatism. It can not be said that is extreme when three-fourths of a body agree to it and must agree to it before a result can be reached; but they tell us it is ancient. I admit that it has around its neck and over its form a cob-web of centuries. It had its birth in the land of our fathers at a time when true men and fair women were carried to the stake and burned for witchcraft. It is just as old as that. Yes, it is ancient. It dates back to a time when tender women and light-bearded men were carried to the scaffold and died because they imagined the death of the king. Imagined the death of the king. Yes, it is ancient. It dates back .to a time when men and women were burned at the stake because they would not admit and confess that the bread and wine was the body and blood of the Savior. Yes, it has all of that; but does that make it right? It dates back to that time when it was declared that the King could not do any wrong, yet, our ancestors more than 100 years ago said that kings could do wrong: and could do such grave wrongs that it justified a colony in rebellion. Now they say it is ancient. I concede it; but these other things I have mentioned are ancient along with it. Is that your argument? Do you meet the proposition on nothing but that? My friend says it has not been considered by the people. Neither was the proposition which you adopted on Friday, and [refused] to reconsider this morning ever discussed before the people, i.e., that a judge could discharge a jury, or a legislature' could authorize him to do it, upon whatever cause the legislature might say they founded it. We have there broken down a provision that stands in every Constitution almost in the American Union and has stood in every Constitution Alabama has ever had. My friend suggests why it took só long *122 after the decision in the Dartmouth College case to reach the proposition that the legislature had the right to amend or repeal a private charter. All these things are hedged about with these ancient things. But I want to put the question to you upon its merits: Why have twelve men all the virtue and it don't abide in one? If there is virtue in the twelve, it must be conceded in the greatest number of things that there is eleven times as much virtue in the eleven as there is in one. Then what right has one man possessed with no more intelligence and with no more knowledge and no better information, what right has he to stand up and thwart the will of the eleven. Now we are advancing. We are in the [new]-day of the Twentieth Century. As civilization and light falls upon the earth, men advance. So we only know it is a thing of the past simply because it had its origin in the dark ages. We know, those of us who have practiced law, we know that in many cases one man defeats the will of the eleven, either because he is corrupt, or because he sometimes has been prejudiced by some tale of woe poured into his ear. It is easier to reach one man than three or four. It purifies the channel of justice and the stream that flows from that channel. It makes it practically impossible for a man with money or prejudice to tamper with the jury. He can’t tamper with four men. He takes too many chances. Do you think it is as wild a theory as some our friends would make you believe, when such men as Justice Brewer of the Supreme Court of the United States declared in its favor, and when one of your Supreme Court Justices says it is right? Now let us look at it as thoughtful, reasonable and dispassionate men, without regard to who advocates it or who does not. If it is right, let us keep it there. If it is wrong let us take it away.” Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1707-09.

. Delegate Weatherly argued, in part:
"MR. WEATHERLY: Now, in addition to that, I want to present this fact to this view of this Convention. My own ideas about the real essential value of a jury trial which requires unanimity is this, it protects those who are unpopular in the community and who would otherwise be oppressed under the laws of God; but there is always one men at least can be found who will stand up for the right, though the heavens fall. Talk about corporations. Yes, of course, corporations are weak in public opinion and it is a protection to them; but there are others for the Convention to consider. Any men of wealth in the community may be unpopular, not so much on account of his wealth, but the way he got it. That is no reason why he should not have a fair jury trial. Corporations have the right to exercise the right of eminent domain. They can come to the gentleman of Washington or they can come to you and take your land from you but they would have to pay you for it; but maybe you don’t want to give up your land. You go to a jury to try that question; and under this ancient law, which is being ridiculed here today, your rights are protected, because it takes twelve men to say whether or not you shall give it up and how much shall be paid for it. Whereas, under the amendment here proposed, this corporation could go in there and submit its case and on the first consultation nine men out of the 12 would be against you; and they would not reason and they would not deliberate but they want the railroad to come in or the rolling mill to be established or the cotton mill in their midst, they want the public improvement and the whole town is against you and your only protection is the one or two men on that jury.
"The time has been, Mr. President and gentlemen of this Convention, when the minority representation on the jury in the Federal Court was worth its weight in gold — in gems of the most priceless value, in the South. Recall the days of reconstruction and you can recall them. When you were before the Federal courts the only barrier that stood between you and utter humiliation was the minority on the jury. If there is anything in the world that inspires — I was almost about to say disgust, but I won't say that; but it inspires indignation for men to come here and attempt to overthrow an ancient institution having elements in it which were put in it for the express purpose of protecting the weak against the strong. What can we foretell as to what conditions will confront us in this country, especially if we undertake the suffrage law or even if we do not? How can any man predict the conditions that will arise which will require the protection of this jury institution, as we have it now? "MR. BURNS — Will the gentleman permit an interruption?
“MR. WEATHERLY — I must decline to be interrupted, Mr. President. Now they ridicule it because it is ancient. The gentleman has said that it was contemporaneous with the doctrine that the King could do not wrong, yet the English people cut off Charles First's head and destroyed that doctrine and left their jury system intact. Why the English people and the system, gentlemen, are ten centuries old. Think of it, one thousand years old; and the English people have progressed and lived upon it. The highest social body in the world today, the English people, and they have gone through their court procedure and reformed them root and branch. The English system of law is nothing today like it was one hundred *123 years ago. They have changed and reformed it entirely, but no Englishman has dared to lay his hand on this great institution.
“You might as well say a jury should be reduced to eight. Why have twelve instead of eight. That would require less deliberation. They would do it quicker but the reason is it was put there for a purpose, it is a goodly number of men and it adds deliberations in the formation of a verdict.
"MR. BROOKS — The proposition that two-thirds of a jury may render a verdict is, as has been well stated by the gentleman who has taken his seat, a radical departure from our system of trials; but it is not a new proposition by any means. It has been discussed for many years, and has received the favorable consideration of some of the strongest men in this country. It is an innovation and it is true that innovations are not always improvements, but a blind adherence to a system consecrated by time merely will make it impossible ever to have innovations that are improvements.
"Now, the gentlemen who oppose this proposition talk about its overturning the theory and policy of centuries, that it is a removal of the ancient landmarks. But, sir, well settled principles as well settled precedents
and customs must sometimes be modified by changed conditions and they must yield to the demand of an enlightened public sentiment. The conversation to reject merely because they overturn precedent and custom handicaps progress, and if we will apply to well settled precedents and customs we may as individuals and as a people if we profit by experience, make stepping stones of our dead selves to better things. When this matter was up for discussion, I listened in vain for argument from those who are opposed to it, and not one word was said in debate. This distinguished convention, which has always been so generous in its views in respect to any matter before it, so far as the opposition to this proposition is concerned, was as dumb as an oyster.”
Vol. 2, Official Proceedings, Constitutional Convention of 1901, State of Alabama, pp. 1711-13.

. For another expression of the wfil of the people, see Alabama Constitution, Art. VI, § 6.11 (the Judicial Article, ratified December 18, 1973), which states, among other things: "... the right of trial by jury as at common law and declared by Section 11 of the Constitution of Alabama 1901 shall be preserved to the parties inviolate.”